**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ANNABELLE STELLANTIS GRACE
A/K/A
Jason South
57903-019
Carswell, FMC
PO Box 27137
Fort Worth, TX 76127                          **Index No.:** 22-2518(TNM)

*Plaintiff*,

v.

FEDERAL BUREAU OF PRISONS,
FBOP DIRECTOR COLLETTE S.
PETERS, DR. ALISON LEUKEFELD,
JENNIFER EPPLIN, J. DOE #1,
TRANSGENDER EXECUTIVE
COUNCIL ("TEC") MEMBERS
J. DOES #2-12, SHANNON ROBBINS,
DON LEWIS, DR. ELIZABETH STAHL,
IAN CONNORS, TRANSGENDER
CLINICAL CARE TEAM ("TCCT")
MEMBERS J. DOES 1-12,
WOMEN AND SPECIAL
POPULATIONS BRANCH
MEMBERS J. DOES 1-12,

*Defendants*.

---

**COMPLAINT**

Plaintiff Anna Stellantis Grace[1], by and through counsel respectfully states as follows:

---

[1] In keeping with Ms. Grace's legal name, amended on both her birth certificate and her Judgment and Commitment papers, as well as her gender marker, which has also been judicially amended on her

1

## INTRODUCTION

1. The Eighth Amendment has long guaranteed that, when our government incarcerates someone, it has an obligation to care for their medical needs. Yet, when it comes to gender dysphoria, the Federal Bureau of Prisons (hereinafter "FBOP") has categorically prohibited certain treatments for reasons wholly unrelated to medicine or law.

2. This prohibition has only just begun to be effectively challenged, and FBOP has recently put in place written policies that signal an awareness that compliance with the Eighth Amendment forbids blanket bans on care. However, without vigorous advocacy and oversight, it appears that in practice, the ban continues apace, silently reinstated with each new request for care.

3. Annabelle Stellantis Grace, a 44-year-old transgender woman confined in the FBOP, experiences debilitating anguish as a result of severe and inadequately treated gender dysphoria.

4. Separate from, but compounding this issue, Ms. Grace is suffering from unresolved facial trauma resulting from a targeted, gender bias-motivated attack against her, that occurred on September 25, 2019, while she was at FCI Danbury, a male facility under the aegis of FBOP. During this assault, she was beaten and raped, and she now requires, among other things, facial reconstructive surgery.

---

identity and criminal case documents, and in keeping with judicial practice, accepted medical standards, and social standards of respect and dignity, this document will use the name Anna Stellantis Grace and feminine pronouns and honorifics to refer to Ms. Grace. *Cf. Rosasa v. Hudson River Club Rest.*, 96 Civ. 0993 (JFK), 1997 U.S. Dist. LEXIS 8115, at *2 (S.D.N.Y. June 10, 1997). *See also*, *Stanley v. City of N.Y.*, 71 Misc. 3d 171, 184 n.5 (N.Y. Sup. Ct. 2020) (collecting authority on using a transgender person's abandoned name — or "deadname" — and concluding that "Courts addressing the issue have almost uniformly found the practice hostile, objectively offensive, and degrading") (quoting Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Disc. 40, 43 (2020) (*citing G. G. ex rel. Grimm v Gloucester Cty. Sch. Bd.*, 822 F3d 709, 716 (4th Cir 2016))).

5. To alleviate this suffering, and the other harms and risks of harm she faces as a result of sex-based discrimination, she has for a number of years sought, and now seeks via this complaint, gender confirming surgeries (hereinafter "GCS"), most urgently facial feminization surgery ("FFS").

6. From the time she was a child, Ms. Grace understood her gender to be out of line with her sex assigned at birth. She recalls trying on her grandmother's wigs, and her mother's clothing. She reports having had a lot of trouble being around boys and men, who perceived her as "feminine" or "gay," which resulted in her being beat up routinely.

7. She reports that when she was only five years old, she attempted self-surgery to remove her private parts. In the early 1980s there was less general awareness of or language to describe gender identity, and far fewer resources for parents of trans children.  Ms. Grace's mother, who struggled with alcohol use, discovered Ms. Grace's efforts to self-surgery and without inquiring further, simply castigated and punished her. Thus did Ms. Grace come to understand the baffling dangers of gender nonconformity.

8. As she grew up, she endeavored to comply with gender expectations, but she was constantly subjected to homophobic slurs, and violently bullied. She surrounded herself with girls, who she says would shelter her and, she says, "a lot of time saved me" from extreme violence.

9. As a result of this targeted bullying, she had a lot of trouble in school, and ultimately developed a highly oppositional and sometimes violent persona in an effort to overcompensate for her perceived gender nonconformity.

10. Nevertheless, however hard she tried to perform masculinity, she ended up borrowing perfume and underwear from her girlfriends, sometimes getting caught and screamed at, mocked, or punished, but never finding understanding or language to describe herself.

11. Although her efforts to act tough often backfired, resulting in more violence, Ms. Grace spent years cultivating an unsophisticated performance of masculinity, which meant that she often behaved in ways that were both unlawful and harmful. Her involvement with firearms, in particular, is something she sees as a kind of performative overcompensation, which "screwed up my whole life," and she sees the general ignorance of trans identity, including her own ignorance, as a pivotal underlying issue. "If I had understood my own gender, I wouldn't have acted like that, and my whole life would have been different," she says.

12. As is the case with many incarcerated trans women, her offense conduct and various defensive behaviors can best be understood as extreme maladaption to a culture in which she felt compelled to hide herself from her peers on pain of ostracization and violence.

13. Perhaps even more tragically, she lacked the tools, words, ideas, and role models she would have needed to understand or describe herself *to herself*.

14. Ms. Grace is transgender, meaning that her gender identity is not aligned with her sex assigned at birth. She is also asexual, which means she is not sexually attracted to people of any gender. In the absence of language to disambiguate and precisely describe sex, gender, and sexual orientation, Ms. Grace (and most if not all of those around her) could not describe her identity in a way that she recognized.

15. It was not until 2018, after reading an article about a trans fashion model, that Ms. Grace finally encountered a conceptual vocabulary adequate to the task of describing her own sexual and gender identity. She recalls this as a moment of profound shock, recognition, and relief.

16. The very next day she spoke to Dr. Winters, an FBOP psychologist, who agreed with Ms. Grace's self-perception. He diagnosed her with extreme gender dysphoria but decided not to

4

put in a case alert due to the fact that Ms. Grace was fearful of other people finding out that she was transgender.

17. In the course of FBOP staff at that facility trying to help her to safely access care, Ms. Grace was sent to FCI Danbury. While at Danbury, she alleges, commissary staff disclosed her gender identity to other prisoners without her consent, and she was – strategically – left alone and unsupervised in a manner that made it possible for other inmates to physically and sexually assault her.

18. In addition to the tremendous trauma of being raped, her face and head were punched and kicked, and she sustained serious injuries, including six fractures. Her orbital was badly broken and is now recessed; she has lasting numbness and pain over more than 60% of her face, her jaw was broken in two places, and her sinuses were injured such that she has perpetual issues with drainage. She takes a great deal of medicine to deal with the pain. FBOP has never denied that surgery is required to repair the damage, and although she has been taken to a number of surgical consultations over the last four years, such surgery has yet to be performed.

19. Her facial injuries are not only medically significant with respect to pain and function; they are greatly exacerbating her gender dysphoria. Ms. Grace ought to have reconstructive surgery to repair the serious damage to her face, and on information and belief, facial feminization surgery would be clinically indicated to happen simultaneously, to minimize the risk of nerve damage or other complications that increase with each instance of facial surgery.

20. Ms. Grace's entire life has been shaped by the agonizing tension between the immutability of her gender identity and the often life-or-death danger of publicly living her truth.

5

21. As a result of the stigma of being a trans woman, she has endured exploitation and sexual violence, discrimination and exclusion, and the loss of stable community and family.

22. In spite of the various social impediments to living openly as a woman, up to and including potentially lethal violence, and despite the many times she has made the anguished effort to adopt protective gender-conforming camouflage in order to keep herself safe and maintain critical relationships, at no time during her life has Ms. Grace's gender identity shifted.

23. Ms. Grace is transgender. Just like being cisgender (meaning "not transgender"), being transgender is natural and is not a choice, or a psychiatric condition. *See* Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012).

24. Ms. Grace, like many trans[2] people, has been diagnosed with gender dysphoria ("GD").

25. GD is the distress caused by a discrepancy between a person's gender identity and that person's sex assigned at birth.

26. GD is a serious, but ***highly treatable*** medical condition, for which safe, effective, accessible treatments have existed for decades.

27. Since Ms. Grace's disclosure of her gender identity in 2018, FBOP medical staff have repeatedly confirmed and validated her diagnosis of gender dysphoria – again, a serious medical condition.

28. FBOP medical staff have repeatedly assessed her and have communicated to FBOP that despite receiving some treatments, she continues to have severe and persistent Gender Dysphoria, a condition that can be alleviated by effective clinical treatments that have been standard for nearly a century.

---

[2] "Trans" is used interchangeably with "transgender," and both are adjectives.

29. FBOP nevertheless refuses to approve Ms. Grace for gender conforming surgery (GCS), a safe, and highly effective treatment for Ms. Grace's currently unmet serious medical need.

30. Significantly, FBOP neither offers any alternative treatment to GCS, nor has FBOP even ordered that she be assessed for GCS. Her grievances have been exhausted, but there have been no denials that give any meaningful information as to how she might effectively proceed; each arm of the agency simply points her to another office or instructs her to consult with her medical staff – who instruct her to utilize the grievance procedure.

31. Without the medical intervention of gender confirming surgeries, Ms. Grace's life is now and will continue to be in peril.

32. Ms. Grace therefore brings this action for declaratory and injunctive relief to compel Defendants to render to her the medical treatment they are constitutionally and statutorily required to provide.

## PARTIES

33. Plaintiff Annabelle Stellantis Grace is a 44-year-old transgender woman in the custody of the FBOP at FCI Tallahassee, a facility for women.

34. Defendant Federal Bureau of Prisons ("FBOP") is the federal executive agency charged with managing and regulating all federal penal and correctional institutions, including FCI Tallahassee. The FBOP is responsible for Ms. Grace's medical care, for protecting her from certain harms, and for compliance with Constitutional mandates and Executive Orders. The Bureau is headquartered in Washington, D.C.

35. Defendant Collette S. Peters is the current Director of the FBOP. As director, Defendant Peters is the ranking official in the FBOP, and is responsible for the administration of all FBOP operations, including the form, substance, and implementation of Program Statements and

other written policies, and the practical realities of all aspects of FBOP administration, including the conduct of FBOP employees, contractors, and lower authorities. On information and belief, Ms. Peters is the final decision-maker for treatment decisions made by the FBOP Health Services, the FBOP's Medical Directors, and the FBOP's Transgender Executive Council ("TEC"). Ms. Peters is sued in her individual and official capacities, pursuant to *Bivens*. 403 U.S. 388 (1971).

36. Defendant Ian Connors is the National Inmate Appeals Administrator in the Office of General Counsel for the FBOP. He, among other named Defendants, has been responsible for reviewing and denying, or constructively denying, Ms. Grace's well-supported requests and administrative appeals for GCS. He is sued in his individual and official capacities.

37. Defendant Doe, on information and belief an attorney for FBOP, is responsible for having made a decision to avoid consideration of Ms. Grace's request for necessary medical care to treat a serious medical condition on the basis of non-medical considerations, in furtherance of a *de facto* internal blanket ban on gender confirming surgeries. Defendant Doe is sued in their individual and official capacities.

38. Defendant Dr. Elizabeth Stahl is the Clinical Director of the FBOP Health Services Division. She is responsible for medical, dental, and mental health services provided to Federal prisoners in Bureau facilities, including health care delivery, infectious disease management, and medical designations. She is sued in her individual and official capacities.

39. FBOP Transgender Executive Council (hereinafter "TEC") is the FBOP entity that reviews medical recommendations regarding treatment for transgender prisoners, including Ms. Grace.[3] The TEC is comprised of FBOP management personnel, including non-medical

---

[3] On information and belief, the TEC claims not to "make" decisions about medical care, but since they review recommendations without either approving or denying them, and since, on information and belief, their approval is

8

personnel, who oversee the FBOP's clinical treatment recommendations for transgender prisoners such as Ms. Grace. *See* FBOP P.S. 5200.04, the revised Transgender Offender Manual, 2022, *available at*

*https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwj JmbWGzP-*

*AAxUClYkEHa9JAIwQFnoECA0QAQ&url=https%3A%2F%2Fwww.bop.gov%2Fpolicy%2 Fprogstat%2F5200-08-cn-*

*1.pdf&usg=AOvVaw3RYQHjYmM4R0BCG5wSCl99&opi=89978449"*https://www.google.co m/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjJmbWGzP-AAxUClYkEHa9JAIwQFnoECA0QAQ&url=https%3A%2F%2Fwww.bop.gov%2Fpolicy%2 Fprogstat%2F5200-08-cn-1.pdf&usg=AOvVaw3RYQHjYmM4R0BCG5wSCl99&opi=89978449 *(last visited August 28, 2023)*. The members of the TEC are responsible for constructively denying Ms. Grace's request for GCS. Each member of the TEC, including Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, and Jennifer Epplin, is sued in their official and individual capacities.

   a. J. Doe(s) 2-11 (collectively, the "TEC Does") whose true names are unknown, are individuals who, as agents of FBOP's TEC, did or ratified acts, or failed to do or ratify acts, that caused harm to Ms. Grace. She will seek leave to amend this complaint after discovery determines the identities of these Doe defendants. They are sued in their official and individual capacities.

40. The Transgender Clinical Care Team (hereinafter "TCCT") is the organization of individuals, on information and belief including non-medical personnel, responsible for reviewing

---

requisite to any action on the part of the doctors, they are in effect making medical decisions by leaving trans people in perpetual limbo with respect to, in particular, gender confirming surgical treatment recommendations.

decisions or recommendations about the medical care of only transgender prisoners, including Ms. Grace.[4] *See* Medical Management of Transgender Inmates, Federal Bureau of Prisons Clinical Guidance document, 2016, *available at*: https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf.

    a.  J. Doe(s) 12-21 (the "TCCT Does"), whose true names are unknown, are individuals who, as agents of FBOP's TCCT, did or ratified acts, or failed to do or ratify acts, that caused harm to Ms. Grace. She will amend this complaint after discovery determines the identities of these Doe defendants. They are sued in their official and individual capacities.

## JURISDICTION AND VENUE

41. Plaintiff brings this suit pursuant to the Eighth and Fifth Amendments to the United States Constitution, and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

42. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §1343(a)(4).

43. Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendant FBOP is an agency of the United States.

44. Venue is further appropriate in this district under 28 U.S.C. § 1391(e)(1)(B) because Defendants are employees and agencies of the United States and a substantial part of the events and omissions giving rise to Plaintiff's claims — namely, the refusal to defer to Plaintiff's doctors, and all ultimate decisions not to provide appropriate treatment — took

---

[4] The TCCT, like the TEC, is a bureaucratic organ the decision-making power of which is unclear. It appears that both the TEC and the TCCT have the power to review the recommendations of care providers; it is not clear whether or to what degree they can make conclusive determinations. What is evident is that while they may not approve or deny care, that the treating physicians cannot act without the imprimatur of those bodies, and that trans patients are thus kept in a permanent condition of treatment paralysis with respect to surgically gender affirming treatments.

10

place within the District of Columbia.

## STATEMENT OF FACTS

### I.    Background On Gender Identity and Gender Dysphoria

45. A person's sex is determined by sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics are not always in alignment with each other according to common understandings of binary sex.

46. "Gender identity" is the medical term for a person's understanding of their own gender, and is the primary determinant of what is colloquially referred to as "sex" (but which actually refers to gender).

47. In this sense, it refers neither to the chromosomal markers that are themselves only a rough shorthand for commonly invoked binary genders,[5] nor to the "sex assigned at birth," which is itself delivery-room shorthand for the appearance of the infant's external reproductive organs.[6]

---

[5] Chromosomal markers are neither the only sex-determining genetic markers, nor are they as uncomplicated as the "XX" or "XY" markers associated with sex in the popular imagination. See, e.g.: Lehrman, S. (2007, May 30). When a Person Is Neither XX nor XY: A Q&A with Geneticist Eric Vilain. *Scientific American.* Available online at: https://www.scientificamerican.com/article/q-a-mixed-sex-biology/. Annenberg Learner. (2018.) "Biology of Sex and Gender: Expert Interview Transcripts, Eric Vilain, MD, PhD." Available online at: https://www.learner.org/courses/biology/units/gender/experts/vilain.html

[6] Medical staff assign a *sex* based on the appearance of external genitalia at the time of a child's birth. This does not, as noted in note 4 above, always fall neatly into a single binary category or comport with that child's chromosomal makeup; more to the point, *sex* (a set of biological characteristics expressed in primary sex organs and secondary sex characteristics) is different and distinct from *gender* (a social and cultural construct). See, e.g.: The New Science of Sex and Gender, Editors of Scientific American, *available at* https://www.scientificamerican.com/article/the-new-science-of-sex-and-gender/ last visited August 4, 2021; see also "Human Anatomy Laboratory Manual" Regula, Lis. (2020) Kendall Hunt Publishing. Dubuque, IA, page 412.

11

48. Everyone has a gender identity, and gender typically figures as a prominent, often core attribute of an individual's personal, psychological, and social life.

49. For most people, their sense of gender is intrinsic, and not subject to influence or alteration by coercive social pressures or even outright punishment.

50. Efforts to change someone's gender identity are not only futile but dangerous, leading to distress or even suicide.

51. Many people identify as either male or female, and this identification is often, but not always based on the sex they were assigned at birth.

52. Persons who identify with the sex they were assigned at birth can be referred to as cisgender ("cis-" meaning "the same as"). People whose gender identity does not conform to the sex they were assigned at birth may identify as transgender.

53. A trans man is a man who was assigned female at birth. A trans woman is a woman who was assigned male at birth.

54. Both cisgender and transgender identities are natural.

55. While being transgender is not a mental disorder, transgender people may experience gender dysphoria. Gender dysphoria[7] is recognized by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V) and the World Health Organization in the International Classification of Diseases (ICD-10). The World Professional Association for Transgender Health (WPATH) defines gender dysphoria as "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)" WPATH Standards of Care, 7th Edition, p. 5.

---

[7] Gender Dysphoria is the term now used by the DSM-V instead of the more stigmatizing and less accurate "gender identity disorder," which was used in the DSM-IV.

56. GD derives from the external conditions that contravene a person's gender, and is thus treated by alleviating the medical, psychological, and social barriers to living fully within the individual's gender identity.

57. If untreated or mistreated, gender dysphoria can lead to serious risks and harms, including both physical and mental health effects.

58. Gender dysphoria is a serious medical condition, but it is extremely treatable. For decades, the medical community has been aware of safe, highly effective treatments for GD.

59. These treatments vary according to the needs of the individual, but typically involve components of the following: 1) social transition to adopting gender roles, names, and style; 2) hormone therapies, which can alter some secondary sex characteristics; 3) therapy, largely to process and build resilience to stigma; and 4) genital ("bottom") and/or chest ("top") surgery to bring the body into conformity with the individual's gender. *Id.* pages 9-10.

60. FBOP medical staff and administrators concur that Ms. Grace suffers from GD.

61. Since at least 2021, FBOP medical staff have communicated to FBOP administrators that hormones, therapy, and social transition treatments are not adequately controlling Ms. Grace's GD. Genital surgery, facial feminization surgeries, permanent facial hair removal, vocal feminization surgery, and other gender confirming surgeries – the last remaining treatment for GD – are medically necessary for the effective treatment of Ms. Grace's GD.

62. Defendants have refused to provide this treatment, citing no medical rationale.

63. In the absence of this care, Ms. Grace experiences extreme anxiety, depression, and the mental torture of feeling her core gender identity as inconsistent with her physical body. Much of that distress is focused on her face, such that necessary daily tasks like shaving and just interacting with others are fraught with dread and anguish.

13

64. Even more, because much of her distress is focused on her face, which she of course cannot conceal under clothing, the distress is simply inescapable. This dysphoria has been complicated by the fact that shortly after coming out to FBOP staff, Ms. Grace was "outed"[8] by a staff member to other prisoners, who subjected her to a vicious transphobic assault, causing tremendous harm to her face, as described above.

65. She requires reparative surgery on her face, and on information and belief, at least one of the consulting surgeons has indicated that this surgery should be done at the same time as any other facial surgery, to minimize the possibility of nerve damage. Neither reparative nor feminization surgery has been done; both are urgently necessary.

66. Ms. Grace keeps suicidal ideation and thoughts of self-harm and self-surgery at bay only by her hope of accessing the gender-affirming care she needs.

## II. Accepted Standards of Care for Transgender Persons

67. The leading organization for transgender healthcare standards is the World Professional Association for Transgender Health (WPATH). WPATH publishes the Standards of Care, the most recent edition of which was published in September 15, 2022.[9]

68. The Standards of Care were developed in 1979, and prior to the recent publication of the Eighth edition, were last updated in 2012. These Standards of Care are used by surgeons, physicians, psychiatrists, psychologists, social workers, and other healthcare professionals who treat persons with gender dysphoria.

---

[8] "Outing" someone means disclosing their gender or sexual orientation without their consent, either with or without malicious intent. See What Is Outing? By Kristen Fischer for WebMD, *Available at* https://www.webmd.com/sex-relationships/what-is-outing *last visited August 28, 2023*

[9] *available at* https://www.wpath.org/publications/soc *last visited August 28, 2023*

69. Many Courts have affirmed that the WPATH Standards of Care are "the internationally recognized" "consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals."[10] *Edmo v. Corizon, Inc.*, 935 F.3d 757 at 769, 788 (9th Cir. 2019).

70. Every major medical professional association concurs that for many transgender individuals with gender dysphoria, surgeries are medically necessary and <u>not</u> <u>elective</u>.

71. The American Medical Association, Endocrine Society, American Psychiatric Association, the American Psychological Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the National Association of Social Workers, and the World Professional Association for Transgender Health, have already endorsed gender confirming surgeries as "medically accepted, safe, and effective treatments for gender dysphoria." *Flack v. Wisconsin Department of Health Services* 395 F.Supp. 3d 1001 at 1014, 1015 (W.D. Wisc. 2019).

72. The National Commission on Correctional Health Care ("NCCHC") is the leading organization of correctional health professionals.

73. NCCHC endorses the WPATH Standards of Care.

74. The WPATH Standards of Care apply to all trans people, regardless of their housing situations.

---

[10] *See also, Flack v. Wisconsin Department of Health Services* 395 F.Supp. 3d 1001 at 1014, 1015 (W.D. Wisc. 2019); *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom. Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020); *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730 (E.D. Va. 2018); *Norsworthy v. Beard,* 87 F. Supp. 3d 1164, 1170 (N.D. Cal.), <u>appeal dismissed and remanded,</u> 802 F.3d 1090 (9th Cir. 2015); *Campbell v. Kallas*, 936 F.3d 536, 551 (7th Cir. 2019); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 543 (S.D. Ill. 2019), <u>on reconsideration in part sub nom.</u> *Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020); *Doe v. Pennsylvania Dep't of Corr.*, No. 120CV00023SPBRAL, 2021 WL 1583556, at *2 (W.D. Pa. Feb. 19, 2021), <u>report and recommendation adopted,</u> No. CV 20-23, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021); *D.T. v. Christ*, No. CV-20-00484-TUC-JAS, 2021 WL 3419055, at *3 (D. Ariz. Aug. 5, 2021); *Pinson v. United States*, 826 F. App'x 237, 240 (3d Cir. 2020).

75. WPATH states that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions" and that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization [and] [d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations." *Id.* pages 67-68.

76. The new WPATH standards set forth seven diagnostic criteria for recommending genital surgeries, as follows:

a. Gender incongruence is marked and sustained;

b. Meets diagnostic criteria for gender incongruence prior to gender-affirming surgical intervention in regions where a diagnosis is necessary to access health care;

c. Demonstrates capacity to consent for the specific gender-affirming surgical intervention;

d. Understands the effect of gender-affirming surgical intervention on reproduction and they have explored reproductive options;

e. Other possible causes of apparent gender incongruence have been identified and excluded;

f. Mental health and physical conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits have been discussed;

g. Stable on their gender affirming hormonal treatment regime (which may include at least 6 months of hormone treatment or a longer period if required to achieve the desired surgical result, unless hormone therapy is either not desired or is medically contraindicated*).*

Page 258, Eighth Edition WPATH Standards of Care, *available at*:

https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

77. Ms. Grace meets and exceeds each of these seven diagnostic criteria.

16

78. A note: the previous edition of the WPATH standards included a diagnostic criterion that suggested the need for candidates to undergo one continuous year of what was called "real life experience" living socially in their target gender. This recommendation has been eliminated. A transgender person is always experiencing the real-life experience of living as their own gender. That experience may include the incredibly negative impacts of having one's gender perceived as less-than-legitimate by others, but the perceptions and behaviors of other people do not actually make the experience of gender any less "real". This truth has special significance in Ms. Grace's case.

79. Although she was temporarily removed from a women's facility, her experience at Seagoville was essentially that of a woman who had been mis-designated to a men's prison, complete with all the terror and harassment that implies. Her real-life experience was, for a time, unimaginably frightening, but it was no less "real". That Ms. Grace was moved against her will into an inappropriate and dangerous facility cannot ethically, medically, or legally be used to disrupt the timeline of her path to gender affirmation.

80. WPATH has unambiguously affirmed that "medical procedures attendant to gender affirming/confirming surgeries are not … optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition," continuing "In some cases, such surgery is the *only* effective treatment for the condition, and for some people genital surgery is essential and life-saving." WPATH Statement on Medical Necessity, Dec. 21, 2016, *available at:* https://www.wpath.org/newsroom/medical-necessity-statement.

81. FBOP has revised its guidance on the provision of gender affirming surgeries, in the wake of litigation and settlement, an Executive Order on gender nondiscrimination, and changing

17

cultural understandings of gender identity. To wit, the TOM in its most recent iteration now says that "surgery may be the final stage in the transition process and is generally considered after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility." P.S. 5200.08, *supra*, p. 9.

82. Several of these conditions are unrelated to medical considerations, and the policy is thus dangerously analogous to making the provision of insulin to a diabetic patient contingent upon his recent disciplinary record – a policy that would surely be immediately legible as an act of deliberate indifference and failure to provide medically necessary care in violation of the Eighth amendment.

83. Additionally, by conditioning the consideration of surgery upon a year in a gender affirming facility, the revised TOM now sets forth a condition that is not only contrary to the revised WPATH standards, but over which it has exclusive control. That is, FBOP could perpetually delay a prisoner's consideration for surgery by placing her temporarily in a men's facility at intervals of under a year. This, in essence, appears to be what happened to Ms. Grace.

84. FBOP has provided Ms. Grace with three of the four recognized treatments for GD: changes to gender expression or role; hormone replacement therapy; and psychotherapy to promote resilience, address stigma, and increase self-esteem.

85. But FBOP has denied Ms. Grace access to the fourth treatment option – surgeries – despite knowing that GCS is a medically necessary treatment for a serious medical need, and that Ms. Grace's GD is not being adequately treated by the other three treatments.

86. The medical consensus regarding GCS is acknowledged by every major medical and psychological association in the United States, the United States Department of Justice, and

18

even the Federal Bureau of Prisons itself.

### III.   Standards of Care as Reiterated in the FBOP's Transgender Offender Manual and Other Program Statements

87. The FBOP sets forth its governing policies in "Program Statements" (hereinafter abbreviated as "P.S.").

88. P.S. 5200.08, titled The Transgender Offender Manual ("TOM") authorizes or mandates the FBOP to render appropriate gender transition related medical treatment following an individual assessment, including referrals to both medical services and psychotherapy. P.S. 5200.08, Transgender Offender Manual, Available at: *https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact= 8&ved=2ahUKEwil5o-x2v- AAxUEMlkFHb6NDFwQFnoECAIQAQ&url=https%3A%2F%2Fwww.bop.gov%2Fpolicy% 2Fprogstat%2F5200-08-cn- 1.pdf&usg=AOvVaw3RYQHjYmM4R0BCG5wSCl99&opi=89978449 last visited August 28, 2023*.

89. P.S. 6010.05 ensures that prisoners have access to evidence-based care and reiterates the Eighth Amendment's imperative that all prisoners be given medically necessary care. P.S. 6010.05, *available at: https://www.bop.gov/policy/progstate/6010-005.pdf*.

90. P.S. 6031.04 outlines the procedures necessary to approve and to provide prisoners with medically necessary care. P.S. 6031.04, *available at: https://www.bop.gov/policy/progstate/6031-004.pdf*.

19

91. Both P.S. 6010.05 and 6031.04 include in their purpose the provision of medical care "in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission."

92. The FBOP's own program statements, including the Transgender Clinical Care Guide set forth a clear path to the provision of GCS, and in fact Ms. Grace's care providers, employed by the FBOP, have followed that path in individually evaluating her for GCS, and communicating to the TEC and TCCT that Ms. Grace needs GCS to treat her diagnosed GD.

93. On information and belief, the TEC[11] and TCCT[12], are made up of people who have never seen or treated Ms. Grace.

94. Every single person with medical expertise or clinical credentials who has evaluated Ms. Grace has observed and affirmed her diagnosed GD.

95. The TEC and TCCT are made up of people, many of whom, on information and belief, have no medical expertise or clinical credentials whatsoever.

96. Thus, the TEC and TCCT are making medical decisions on the basis of non-medical judgments.

97. The TEC and TCCT exist specifically and only to make decisions about the medical care of only transgender prisoners.

---

[11] The TEC is a body established by the FBOP under Program Statement 5002.04 (now 5002.08), The Transgender Offender Manual. The TEC consists of "staff members from the Health Services Division, the Female Offender Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel." The identities of the TEC members and therefore their qualifications are currently unknown; discovery may clarify whether or to what degree TEC or TCCT members are actually possessed of any clinical competence, expertise, or authority. Counsel wishes to reserve further pleadings in this regard.

[12] Assuming the BOP followed the protocol set forth in the Clinical Care Guide (See document available at https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf), Ms. Grace's requests for GCS should also have been submitted to the TCCT, which should have made a recommendation to the medical director.

20

98. The medical care of cisgender prisoners and prisoners who are not diagnosed with GD is not overseen by non-medical personnel.

99. A cisgender man whose doctor recommends an orchiectomy for the treatment of any condition other than GD, such as testicular cancer, would not have the treating physician's recommendation monitored or commented upon or delayed by non-medical personnel.

100.    Nor would that cisgender man have that recommendation monitored or commented upon by the TEC or the TCCT.

101.    A cisgender woman whose doctor recommended a double mastectomy and hysterectomy for the treatment of any medical condition other than GD, such as breast or uterine cancer, would not have the recommendation monitored or commented upon or delayed by non-medical personnel.

102.    Nor would that cisgender woman have that recommendation monitored or commented upon by the TEC or the TCCT.

103.    Upon information and belief, there is no similar body to either the TEC or the TCCT that monitors, comments on, and controls medical care for cisgender prisoners similarly situated to Ms. Grace.

104.    At a minimum, the requirement that the medical care of transgender prisoners or prisoners with a diagnosis of gender dysphoria be supervised by two separate bodies, neither of which includes the patient's treating care providers, and both of which, on information and belief, include non-medical personnel, who interfere with and override the medical decisions of the actual treating care providers, contributes to, as in this case, extreme delay in the provision of medically necessary care, and a separate, unequal system of healthcare for some prisoners, explicitly on the basis of sex, gender identity, and GD diagnosis.

21

**IV. Plaintiff Grace's Efforts to Access Effective Treatment for Gender Dysphoria**

105.  At the time of the arrest leading to her current incarceration, Ms. Grace was diagnosed with "Gender Identity Disorder" – a diagnosis since replaced in the DSM V by Gender Dysphoria.

106.  Since 2018, Ms. Grace has at various times requested all of the possible treatments for gender dysphoria, including designation to a women's facility to facilitate social transition, individualized psychotherapy, feminizing hormones and masculine hormone blockers, and facial feminization, vocal coaching and surgery, vaginoplasty, breast augmentation, and permanent facial hair removal.

107.  Since 2018, the FBOP has been rendering some forms of gender affirming care to Ms. Grace, including hormone therapy, counseling, and designation to a women's facility.

108.  According to the undisputed conclusions of FBOP medical staff, Ms. Grace has GD, a serious medical need, that has not been adequately treated by current clinical interventions, which constitute three of the four possible treatments for GD.

109.  Only facial and genital surgery to bring the body into conformity with the individual's gender, known to be safe and effective, remain to treat Ms. Grace's GD. She meets or exceeds the clinical criteria for this surgery.

110.  On information and belief, only one federal prisoner in the FBOP has ever actually received GCS. See *Fisher v. Federal Bureau of Prisons*, 4:19-cv-01169-SL, Deposition of Dr. Elizabeth Stahl, Dkt. 63, p. 20, line 13; page 22, line 4, indicating that no prisoner had ever received such surgeries; thereafter Donna Langan was approved for and finally received both top and bottom

22

surgeries in December 2022, making her the first, and on information and belief the only person actually in FBOP custody to have ever received such surgery.

111.   Upon information and belief there are at least 1300 transgender persons in the custody of FBOP.

112.   Upon information and belief, the TEC and TCCT has recommended against or otherwise prevented GCS for nearly all other prisoners in the federal prison system who have sought it as a treatment for GD.

113.   Upon information and belief at least one other individual was recommended for GCS; that recommendation was made nearly a year ago, and no further action has been taken.

114.   FBOP has neither offered an alternative treatment to supplement the currently insufficient treatments, nor disputed that the current treatment is inadequate, and that GCS is medically necessary; nevertheless, FBOP has not approved Ms. Grace for GCS.

115.   Since 2018, Ms. Grace has continuously requested gender affirming care, including GCS, through the appropriate administrative channels[13]. Her efforts to access GCS, or even an evaluation to determine the appropriateness of GCS to treat her GD, have been met with evasiveness and a near-Kafkaesque drama in which each bureaucratic arm directs her to another office.

116.   Ms. Grace has also attempted to FOIA the minutes of the TEC meetings at which her case may have been discussed. These requests have not been answered and it is therefore not

---

[13] Ms. Grace's initial Complaint in this matter included a number of requests for remedies in addition to GCS. Specifically, she requested that FBOP acknowledge her legal sex (F) and her legal name, which were changed in the state of Oregon on November 10, 2021, and then amended on her Judgment and Commitment papers by her sentencing Judge in the Middle District of Georgia on January 25, 2022, in accordance with the protocol set forth by FBOP in its own program statements. She also requested that she be appropriately designated to a women's facility. FBOP finally did come into compliance with its own policies and Ms. Grace's information was corrected in SENTRY, and she was appropriately designated to a women's facility. Claims related to her name, gender marker, and designation are therefore mooted and have not been included in this First Amended Complaint.

clear whether the TEC has in fact discussed the matter, and if so, what determinations may or may not have been made.

117.    In any event, Ms. Grace's requests for facial and vocal feminization surgery, vaginoplasty and breast augmentation, and permanent facial hair removal have been denied, without clear rationales, and certainly in the absence of any explicit medical rationale.

118.    Ms. Grace's requests for GCS have now spanned years, and on information and belief, include the following efforts:

   a.    On or about November 19, 2019, Ms. Grace requests GCS, and is denied, having exhausted remedies (Fort Dix);

   b.    On or about August 13, 2020, Ms. Grace requests GCS, and is denied, having exhausted remedies (FCI Milan);

   c.    On or about July 21, 2021, Ms. Grace requests GCS, and is denied, having exhausted remedies (FCI Sheridan);

   d.    On or about April 8, 2022, Ms. Grace requests GCS, and is denied, having exhausted remedies (FMC, Carswell). At that time, on information and belief, Ms. Grace was informed by Carswell medical staff that FBOP does not provide *any* gender confirming surgeries to prisoners, and that she ought not expect to be approved.

119.    Further information about Ms. Grace's experience of using the administrative remedy process is warranted here. While at FMC Carswell, Ms. Grace was placed in the Special Housing Unit. She was not informed of a reason for this, and no disciplinary process was ever initiated. She grieved her placement in SHU many times, pointing out that no disciplinary or security rationale had ever been offered. A review of available documents

suggests that her grievances were never substantively answered at all. Rather, she was repeatedly directed by Regional (to which office she had directed her grievances, explicitly noting the futility of directing a complaint about institutional misconduct to the institution itself) that she ought to have filed her grievance at the institutional level. When she did so, her grievances were denied, but no disciplinary process was ever initiated and no rationale for her confinement in SHU was ever disclosed.

120.    While housed in SHU at Carswell, Ms. Grace was sexually assaulted by prison medical staff, who attempted to induce an erection, manipulating and measuring her private parts. On information and belief, despite filing a PREA complaint and several grievances, nothing was ever done to investigate or resolve this behavior, which, as alleged, would violate the Prison Rape Elimination Act ("PREA"), the Eighth amendment, and FBOP's own policies, including all past and present iterations of the Transgender Offender Manual.

121.    After more than six months in SHU without explanation, Ms. Grace was transferred to FCI Seagoville, a men's facility, at which she endured constant targeted harassment and threats of sexual and physical violence.

122.    In Spring 2023, Ms. Grace was transferred to FCI Tallahassee, where she has flourished socially and programmatically, but remains in an anguished limbo with respect to her clinical transitional care, and continues to use the administrative remedy process to access GCS.

123.    Over the last five years, Ms. Grace has been caught in an administrative remedy spiral that would make Kafka swallow his own tongue, and nevertheless, she has not given up. She has continually endeavored to use the administrative remedy process, in spite of the fact that her grievances have all essentially been ignored by way of responses that allege a procedural flaw,

or simply direct her to ask a different body, such as the TEC, her doctors, or a different office in the administrative hierarchy.

124. Even now, Ms. Grace continues to seek GCS and to use the administrative remedy structure to challenge the persistent nonresponse to her requests.

125. Ms. Grace has exhausted her administrative remedies multiple times and has renewed requests pending even now.

126. FBOP decision-makers direct her to speak to her doctors, and her doctors direct her to speak to FBOP administrators, despite her having clearly and repeatedly outlined the grievous physical and psychological harms she endures while gender confirmation is endlessly delayed.

127. Further efforts on her part would be futile, obviating any further obligation on her part to pursue remedies from within the FBOP's own administrative system.

128. It should be noted that since her most recent denial, Ms. Grace has nevertheless continued to file requests for GCS.

## V.  HARM AND RISK OF HARM

129. Ms. Grace experiences on a daily basis serious depression, anxiety, suicidality, and an intrusive, compulsive desire to perform self-surgery.[14]

130. Asking to be heard by the Court in her own words, Ms. Grace said: "I found a quote a few months ago that means a lot to me :  'There came a time when the risk to remain tight in the bud was more painful than the risk it took to blossom.' I am taking those risks, and it is the healthy and honest thing to do, to be myself. But without these surgeries, there are other risks

---

[14] Self-surgery must be understood as distinct from the desire to self-harm. It is a desire to perform corrective, ultimately healing surgery, and not a desire rooted in depression, self-punishment, or self-abnegation.

26

that increase, as my understanding of who I am, and how I am seen and treated get farther apart."

131.  Ms. Grace admits that she sometimes feels hopeless, but she is doing her best to have faith that she will be able to access the care she needs if she continues to operate through the approved channels.

132.  Ms. Grace's gender dysphoria is continuously exacerbated by the denial of access to facial feminization, vaginoplasty and other gender confirming surgeries.

133.  This dysphoria is increasingly unsustainable, and is experienced by Ms. Grace as excruciating mental torture.

134.  She brings the following claims for relief.

## CLAIMS FOR RELIEF

## <u>FIRST CLAIM FOR RELIEF</u>

**Failure to Provide Medically Necessary Treatment in Violation of the Eighth Amendment**

*Against FBOP, Defendant Peters, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, and TEC Does and TCCT Does in their individual and official capacities*

135.  Ms. Grace realleges and incorporates by reference all facts set forth in previous paragraphs of this Complaint.

136.  Defendants, including the FBOP, Peters, Stahl, Connors, Doe, and TEC and TCCT defendants, are responsible for providing adequate and necessary medical care to Ms. Grace.

137.  Specifically, Defendant Peters is responsible for ensuring that executive policy and the constitution are consistent with FBOP policies and complied with in all federal prisons.

27

138.    Defendant Stahl is responsible for ensuring that the serious medical needs of prisoners are treated.

139.    TEC and TCCT defendants are responsible for providing advice and guidance to FBOP regarding treatment relevant to Ms. Grace's needs as a trans woman, although as noted above, the very existence of these bodies is discriminatory and Constitutionally suspect.

140.    Defendant Doe 1 is, on information and belief, an attorney in the FBOP Office of General Counsel, responsible for understanding and applying the law as it relates to the provision of medical care for gender dysphoria. Defendant Doe 1 certainly at this point must be aware that once a prisoner is evaluated and said by medical professionals that GCS is a medically indicated treatment, denial of that treatment likely constitutes a violation of the Eighth amendment. On information and belief, Defendant Doe 1, along with others, has taken action to discourage such an evaluation, and such a recommendation, from being made by medical staff in the first place.

141.    Defendants have long been aware that Ms. Grace has been diagnosed with the medical condition of gender dysphoria, the effective treatment of which constitutes a serious medical need.

142.    Defendants are all aware that Ms. Grace has been evaluated many times over the last several years, and that all FBOP medical staff have uniformly found that she suffers from GD that is not being adequately controlled by the treatments she has received and is receiving.

143.    Defendants are all also aware that Ms. Grace has not received the necessary gender confirming surgeries, most urgently facial feminization surgery, but also vaginoplasty, breast augmentation, and the associated permanent hair removal (requisite to the genital surgery) for which she has been recommended, indeed, they are so aware because they are responsible for

28

the denial of that care, and, on information and belief, likewise responsible for discouraging her treating physicians to actually perform a focused assessment regarding her need for GCS.

144. Defendants have failed to follow the FBOP's own written policies.

145. Instead, on information and belief, Defendants appear to be acting in accordance with an *unwritten de facto* policy that operates as a categorically unlawful blanket denial of gender confirming surgeries for all or nearly all trans patients in FBOP custody.

146. Defendants have failed to understand and apply relevant law, and have acted contrary to controlling law, in failing to provide medically necessary care for Ms. Grace.

147. Defendants' acts and/or omissions resulting in deficient care for Plaintiff reflect Defendant's policy, custom, practice, and/or procedure of failing to provide adequate and necessary medical treatment to people who are incarcerated and diagnosed with gender dysphoria.

148. Each Defendant has been and remains deliberately indifferent to Plaintiff's serious medical need to be adequately treated for gender dysphoria, and protection from violence and threats of violence, by ignoring Plaintiff's many grievances outlining the harms they endure and face as a result of inadequately treated GD.

149. Each Defendant has known of Plaintiff's serious medical need for treatment for gender dysphoria and denied reasonable measures to address Plaintiff's continued pain and suffering resulting from her inadequately treated gender dysphoria.

150. All defendants are or should be aware that providing "some" medical care for a serious medical need is not categorically sufficient to avoid an Eighth Amendment violation.

151. Defendants' continued denial of necessary medical treatment is causing irreparable harm and unnecessary suffering to Plaintiff, including clinically significant depression and anxiety, and suicidal ideation.

152. Defendants' failure to provide adequate and necessary medical treatment to Plaintiff violates the Eighth Amendment to the U.S. Constitution.

153. Without necessary medical treatment, the condition continues to inflict serious mental distress on Plaintiff. Ms. Grace alleges that in spite of acutely developing her own coping mechanisms and conflict avoidance skills, she has not been able to avoid physical and sexual violence and threats of physical and sexual violence.

154. As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered, and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

155. Every single day Plaintiff does not receive GCS (and facial reconstruction and repair surgeries) causes her irreparable harm.

156. Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard for the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

157. It is unconstitutionally cruel and unusual to expose a prisoner to a substantial risk of serious harm.

30

158.    Denying an incarcerated transgender person the right to live fully within and as their gender identity predictably causes harm.

159.    Furthermore, this harm is exacerbated and compounded by the fact that FBOP staff and administrators, including Defendant Ian Connors, know and acknowledge, Ms. Grace has had an unmet medical need for facial reconstructive surgery for the last *four years*.

160.    Much like excessive periods of solitary confinement can predictably generate serious mental health crises among otherwise mentally healthy persons with no history of mental health needs, institutional refusal to render medically necessary gender confirming care, including surgery, can create or exacerbate anxiety, depression, and dysphoria, in turn creating or increasing the likelihood of self-harm or suicide.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Denial of Medical Care on the Basis of Sex or Gender in Violation of Fifth Amendment Rights to Equal Protection**

*Against FBOP, Defendant Peters, Defendant Stahl, Named TEC Members, TEC Does and TCCT Does, Defendant Connors, and Defendant Doe 1 in their individual and official capacities*

161.    Plaintiff realleges and incorporates by reference all facts set forth in previous paragraphs of this Complaint.

162.    The Fifth Amendment's Due Process Clause guarantees persons the equal protection of the laws and bars the Federal Government from treating persons differently than similarly situated others. Review of Fifth Amendment equal protection claims is identical to the adjudication of claims under the Fourteenth Amendment. *Sessions v. Morales*, 137 S. Ct. 1678, 1686 n.1 (2017); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

31

163.   Under the equal protection guarantees of the Constitution, discrimination against transgender people is presumptively unconstitutional and subject to at least heightened scrutiny. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, No. CV 20-11297-PBS, 2021 WL 3667760, at *15 (D. Mass. Aug. 18, 2021); *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020); *Adams v. Sch. Bd. of St. Johns Cty.*, —— F.4th ——, 2021 WL 2944396, *4 (11th Cir. 2021).

164.   Defendants have discriminated against Plaintiff based on her sex and transgender identity by denying her adequate and necessary medical treatment for gender dysphoria.

165.   Specifically, Defendants have denied Plaintiff necessary medical care because she is transgender, because she is attempting to transition genders, and/or because of Defendants' sex-based belief that people who are assigned male at birth should not receive medically necessary care that alters their genitalia, although cisgender prisoners may undergo identical procedures without interference or delay.

166.   Defendants discriminated against Plaintiff because of sex, sex stereotyping, and/or gender identity pursuant to official policies, procedures, customs, and/or practices.

167.   Defendants' discriminatory treatment of Plaintiff because of sex, sex stereotyping, and/or gender identity deprives Plaintiff of her right to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

168.   Under the Equal Protection Clause, discrimination by the government based both on sex and transgender status is tested under heightened scrutiny and is therefore presumptively

32

unconstitutional absent a showing by the government that the discrimination is substantially related to an important state interest.

169.    Transgender individuals as a group possess all the indicia of a suspect class that have been identified by the Supreme Court as triggering heightened scrutiny, including: (1) transgender people have experienced a history of discrimination; (2) transgender people are a discrete and insular minority who lack the political power to protect themselves through the legislative process; (3) being transgender does not limit or affect one's ability to contribute to society and (4) being transgender is a core part of one's identity so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

170.    Defendants' discriminatory treatment of Plaintiff because of sex, sex stereotyping, and/or gender identity is not substantially related to any important government interest, nor is Defendants' discriminatory treatment reflective of any legitimate government interest. Defendant's discriminatory treatment of Plaintiff on the basis of sex, sex stereotyping, and/or gender identity is also not reasonably related to any compelling, rational, or legitimate penological or other state interest.

171.    Defendant's discriminatory treatment is in direct contravention to existing law.

172.    As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered, and continues to suffer, damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

173.    Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct,

33

and/or acted with willful and conscious disregard for the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**Denial of Medical Care on the Basis of Diagnosis in Violation of Fifth Amendment Rights to Equal Protection**

*Against FBOP, Defendant Peters, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, TEC Does, and TCCT Does their individual and official capacities*

174.   Plaintiff realleges and incorporates by reference all facts set forth in previous paragraphs of this Complaint.

175.   By official policy, procedure, custom and/or practice, Defendants discriminate against transgender prisoners diagnosed with gender dysphoria, including Plaintiff, by providing them with inferior and extremely delayed medical care as compared to similarly situated prisoners with medical and mental conditions and/or diagnoses other than gender dysphoria.

176.   Defendants' discriminatory treatment of Plaintiff because of her diagnosis of gender dysphoria deprives Plaintiff of her right to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

177.   Defendants' discrimination against Plaintiff based on her diagnosis of gender dysphoria is not substantially related to any important government interest, nor is it even rationally related to any legitimate government interest. Defendants' discrimination against Plaintiff based on her diagnosis of gender dysphoria is also not reasonably related to legitimate penological interests.

34

178. On information and belief, Defendants have created the TEC and TCCT to make decisions or advise on decisions about medical care for transgender prisoners, notwithstanding the recommendations of the treating providers.

179. The TEC and TCCT do not address requests for similar kinds of care by non-transgender prisoners (by way of non-exhaustive examples, a cisgender male prisoner with a testosterone deficiency whose doctors order testosterone injections; or a cisgender female prisoner whose oncologist orders a double mastectomy).

180. The TEC and TCCT have, on information and belief, approved any surgical intervention for any prisoner a handful of times, only in the last year, and only in the context of vigorous and ongoing litigation.

181. The TEC's existence and that of the TCCT constitute a "separate" and therefore inherently unequal mechanism for treatment of transgender prisoners or prisoners with gender dysphoria. *See generally, Brown v. Bd. of Educ. Of Topeka*, 347 U.S. 483 (1954).

182. Because the TEC and TCCT have never approved any surgical intervention over the course of its entire existence, it does not constitute a serious attempt to provide treatment for transgender prisoners.

183. Rather, it constitutes a bureaucratic smokescreen that functions to obscure a fundamental policy choice not to provide certain necessary treatment on the basis of sex:  necessary medical interventions are categorically denied by the TEC and TCCT on the basis of transgender status. *See Bostock v. Clayton Cty.*, 590 U.S. __ (2020).

184. Put differently, the TEC's existence in itself, and that of the TCCT, and their use to instantiate a *de facto* blanket ban on GCS in particular, constitutes an unconstitutional, categorical bar on surgical interventions for transgender prisoners.

185.   It is similarly an unconstitutional, categorical bar on surgical interventions on the basis of diagnosis (e.g., gender dysphoria).

186.   Finally, as alleged above, for all prisoners in the confines of the Fifth Circuit Court of Appeals, the TEC, TCCT, and/or on information and belief, the FBOP Office of Counsel has explicitly instituted a categorical bar to surgical medical interventions on the basis of transgender status.

187.   That express, categorical prohibition of certain treatments on the basis of transgender status and or GD diagnosis is unconstitutional both on its face and as applied.

<h2 style="text-align:center">FOURTH CLAIM FOR RELIEF</h2>
<strong>Violation of Affordable Care Act (42 U.S.C. § 18116)</strong>

*Against FBOP, Defendant Peters, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, TEC Does, and TCCT Does their official capacities*

188.   Plaintiff Ms. Grace repeats and re-alleges the allegations in all preceding paragraphs as if fully set forth herein.

189.   Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, prohibits covered entities from discriminating on the basis of sex for the purpose of providing health care services.

190.   Covered entities include "any health program or activity, any part of which is receiving Federal financial assistance." The Federal Bureau of Prisons is a covered entity subject to the ACA's nondiscrimination requirement.

191.   As set forth above, Defendants have and continue to discriminate against Plaintiff on the basis of sex when they deny her adequate and necessary medical treatment on the basis that she is transgender, has been diagnosed with gender dysphoria, and is attempting to transition genders.

192.  As set forth above, Defendants have and continue to discriminate against Plaintiff on the basis of sex when they deny her adequate and necessary medical treatment on the basis of sex stereotyping and/or a belief that people who are assigned the male sex at birth should not have genital surgeries, including vaginoplasty, predicate treatments such as permanent genital hair removal, and other associated gender confirming treatments.

193.  As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons and any others that may appear to this Court, Plaintiff requests judgment as follows, including:

a. Declaring that Defendants conduct in denying and constructively denying Ms. Grace gender confirmation surgeries and attendant necessary health care violates her rights under the Eighth and Fifth Amendments to the United States Constitution, as well as the Affordable Care Act;

b. Preliminarily and permanently enjoining Defendants, and their employees, agents, appointees, and successors, to facilitate a full medical evaluation by Ms. Grace's health care providers to ensure that her facial reconstruction surgery (the need for which stems from a targeted and transphobic attack that is itself the consequence of FBOP's failure to protect Ms. Grace) including gender confirming facial feminization surgery, as well as vocal feminization and coaching, vaginoplasty, breast augmentation, and effective permanent hair removal (specifically

electrolysis or laser hair removal), together with all attendant necessary health care, are scheduled and completed for Ms. Grace within the next six months, with priority to the primary alleviating treatment of facial feminization surgery;

c. Compensatory, general damages, and special damages, in an amount to be determined at trial;

d. Punitive damages against individual Defendants in an amount to be proven at trial.

e. Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

f. Reasonable costs of this suit and attorneys' fees and expenses, including under 28 U.S.C. § 2412 et seq. (the Equal Access to Justice Act); and

g. All such other and further relief as this Court deems just and proper.

DATED:      August 28, 2021
            NEW YORK, NY

Respectfully Submitted,

_____/s/_____
Moira Meltzer-Cohen[15]
277 Broadway, Suite 1501
New York, NY 10007
c: 347.248.6771
mo_at_law@protonmail.com

_/s/_____
Christopher Leibig, VA # 40594,
Member, United States District Court
for the District of Columbia
421 King St. #505
Alexandria, VA 22314

---

[15] Application for admission filed and swearing in expected September 11, 2023.

38

(703) 683-4310
chris@chrisleibiglaw.com